## Burton v. Commonwealth.

(Decided March 24, 1933.)

B. J. BETHURUM for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

On July 31, 1931, Baniel Burton shot and killed Brent Tarter, and thereafter was indicted for murder by the grand jury of Pulaski county. Judge Roscoe

Tarter, the regular judge of the circuit court, being a distant relative of the deceased, refused to preside at the trial, and the parties agreed on Hon. James Denton as special judge. At the first trial, the jury were unable to agree, and the case was continued. On a second trial before Judge Denton as special judge, Burton was convicted of manslaughter, and his punishment fixed at twelve years' imprisonment. Burton appeals.

The facts are these: Appellant, his sister Julia, and two others were joint owners of a small tract of land on which appellant's residence was located. About a year before the homicide, the deceased, Brent Tarter, married Julia, and had erected a house on the same tract of land about 100 yards distant from appellant's residence. On the afternoon preceding the homicide, which occurred about dusk, appellant and the deceased had played baseball together, had accompanied each other a portion of the way home, and were apparently on good terms. Appellant and his wife had planned to go to church, and after supper the wife of the deceased and some others came to appellant's home for the purpose of accompanying them. After the others left, appellant went to the home of the deceased armed with a shotgun, and fired a lot of buckshot into the body of the deceased. Just prior to the homicide, Jim Dalton, who admitted that he was not on speaking terms with appellant because appellant would not speak to him, his wife, and Grant Taylor were out in his front yard about 125 yards from the home of the deceased. Dalton and his wife testified that they had known appellant and deceased for many years, and that just before the shot was fired heard Baniel say:

"God damn you, you said you'd cut it, and I dare you to cut it. You've got no land, God damn you, the big road is the place for you. I want you to understand that you're fooling with me—you're not fooling with Bill Sherman Burton. Pop off, God damn you; if you can pop off any quicker than I can, pop off."

Shortly after he shot the deceased, appellant went to the home of Virgil Burton, about 300 yards away, to buy additional shells for his gun for the purpose, he claims, of protecting himself against the Tarters. Ola Burton, wife of Virgil Burton, was sitting on the porch about 25 yards from the store. About five minutes

after the shot was fired, she heard him call twice to his wife and say, "Hey, Versie, whoopee." As appellant came around the side of the house, he "hollered" to Grant Taylor and told him to go and tell Versie that he had killed Brent Tarter. Appellant was about 200 yards away when he said that. As appellant came over the hill, and before he got to the store, he said, "I guess I'll go to the pen, but I killed him." Ola Burton then said, "You've not killed Brent, have you?" and appellant said, "Yes, I killed him, God damn him, and he is laying over yonder." Others heard appellant say things of similar effect. Jim Carson Hudson, accompanied by his father and Velma Tarter, was the first to reach the home of the deceased. He never saw any gun under the deceased or about him. Another witness testified to seeing a gun either on the floor or in the corner. Bill Sherman Burton heard appellant say to the deceased: "Get your gun, I dare you to get it. You are a coward if you don't get it."

On the other hand, appellant, after testifying that he and deceased had played ball together the afternoon of the homicide, and that they were on friendly terms, gave the following account of the homicide:

"My wife and sister and some others was going to the Holiness Church, that was about a mile and a half away, and they left me there to lock up the doors; over in the edge of the field there, I saw about a half grown rabbit, and I just thought I would kill it and have it for my breakfast, so I got my gun and started out after it; it went on across the field and I kept following along back of it, I never could get close enough to it to shoot it, and it went on over toward Brent's house, and me after it, and when I got over there pretty close I saw Brent standing there in the door, and I says 'Brent did you see where that rabbit went?' and he says 'To hell with the damned rabbit' and I says 'Ain't you going to Church?' and he says 'to Hell with Church' then he says 'You tell that God damned whore of mine never to come back here,' and I says 'She's got to have protection, and this is her land, and I guess she can come back when she wants to' then he says 'I'm going to tear this God damned old house down and burn it up' and I says 'I wouldn't do that, you are in enough trouble without

doing that,' then he says 'You get out of that corn field, and I says 'I've got a right to be in here' then he says 'Damn you, I'll kill you' and he presented his shotgun at me, and when he come down with his shotgun, I says, 'Don't shoot me, I don't want to have no trouble with you, I've got nothing against you' and he says 'God damn you I told you to get out, and I'm going to kill you' and when he said that, he drawed back the hammer on his gun, I don't know whether he snapped the gun or not, but I think he did, and I throwed up my gun and fired.''

Julia Tarter, the wife of the deceased, and appellant's sister, testified as follows: She spoke to her husband about going to church, and he said, "If I went to church he would kill my brother, and he'd tear the house down and burn it up, and he'd kill me when I come back." Later on her husband said that same thing to Osborn Burton and his sister. About an hour later she went to appellant's home on her way to church, but did not tell him what her husband had said. Osborn Burton testified to the same effect, and Alice Burton testified that she heard Brent Tarter say that he aimed to kill Baniel, but she never told Baniel about it. Ensil Baker testified that a short time before the homicide he heard Brent Tarter say that, if Baniel did not stay away from his house, he was going to get the law on his side and kill him. Lester Baker testified that about eight weeks before Brent Tarter was killed Brent pulled out his gun in his presence and said, "If Baniel Burton monkeys with me again, I guess that will put him out of business." It was not made to appear, however, that any of these threats were communicated to appellant.

Refusal of the court to grant a change of venue is the first ground urged for reversal. At the outset we are met by the commonwealth's contention that the alleged error was not included in the motion and grounds for a new trial. We find, however, that, after the motion for a new trial had been overruled, an appeal granted, and the amount of the appeal bond had been fixed, appellant, at the same term, filed supplemental motion for a new trial on the ground that the change of venue was improperly refused. In the case of Commonwealth v. Neal, 223 Ky. 665, 4 S. W. (2d) 685, we

had occasion to consider the question, and it was held that, although a motion for a new trial has been overruled, an appeal granted, and appeal bond executed, the defendant may file at the same term of court additional motion for a new trial. It follows that the error relied on is available on appeal.

The application was made by petition verified by appellant, and supported by the affidavits of two citizens and residents of Pulaski county, to the effect that appellant could not obtain a fair trial on account of the hostile feeling of the people and the county officers growing out of the influence of Judge Tarter, the regular circuit judge, and a relative of the deceased, who, it was stated, took an active part in the selection of the jury on the first trial, and was a strong partisan of the commonwealth. Counter affidavits were filed by the commonwealth's attorney and four residents and citizens of the county controverting the grounds relied on for the change of venue. Also three witnesses testified orally on the question. Eli Farmer, a county school superintendent, expressed the opinion that the fact that Judge Tarter was a relative of the deceased would influence a certain part of the people from his neighborhood against the defendant, and that, if it was generally known in the county that Judge Tarter was taking an active interest in the case, it was his opinion that it would be almost impossible to get a jury that would give an impartial trial. He based his opinion on the assumption that Judge Tarter did assist in the selection of the jury on the first trial. I. L. Hardgrove expressed the opinion that it would be possible to get a jury from the county to find a verdict of "not guilty" if the law and facts justified a verdict of that sort, notwithstanding the influence of the circuit judge was for a conviction. Frank Beatty did not see why the fact that the deceased's name was Tarter, and he was a distant relative of the circuit judge, would have any influence against the defendant and prevent him from getting a fair trial at the hands of a Pulaski county jury. However, the fact that Judge Tarter was interested in the prosecution might have something to do with the defendant's securing a fair trial, as Judge Tarter had a lot of people up his way who were for him and a lot who were against him. He did not know hardly what to say as to whether the facts would prevent the defendant from getting a fair trial. On cross-examina-

tion he expressed the view that, if Judge Tarter came into the courtroom and took his seat at the table with the attorneys for the commonwealth, it would have a tendency to influence the jury and prejudice them against the defendant. It will be observed that there was no showing of any pronounced public feeling against appellant. The case is simply one where the witnesses expressed rather doubtfully the opinion that the fact that Judge Tarter was related to the deceased, and had taken an active part in the selection of the jury on the first trial, would have a tendency to influence a Pulaski county jury against appellant. In view of this situation, of the difference of opinion expressed in the affidavits, and the counter affidavits, and of the vague and doubtful views of the witnesses, who testified orally on the question, we are not disposed to hold that the trial court abused a sound discretion in refusing the application for a change of venue. But even if the question whether appellant could receive a fair and impartial trial at the hands of a Pulaski county jury were involved in greater doubt, it must not be overlooked that he was tried by a jury summoned from Lincoln county, and it is not to be presumed that a jury so summoned would be affected in the least by the influence of a circuit judge whose jurisdiction was confined to other counties. In the circumstances, it is not perceived how the action of the trial judge in refusing the change of venue operated to the prejudice of appellant's substantial rights.

Another contention is that the court erred in permitting to go to the jury the first part of appellant's statement, "I guess I will go to the pen, but I killed him." The argument is that no man is bound by an admission of law or a mistake of the law in his judgment on his own rights, Craig v. Baker, 3 Ky. (Hardin) 281, and that a mere opinion or conclusion as contradistinguished from a statement of fact may not be proved under the rules relating to admissions and declarations. 1 R. C. L. p. 481. We do not regard this rule as applicable to the statement in question. Appellant was not attempting to express an opinion or conclusion in regard to his legal rights. The statement complained of showed lack of justification in his own mind, and was therefore admissible as an admission tending to show his guilt.

Lastly it is insisted that the court erred in giving the following instruction qualifying the right of self-defense:

"If you shall believe from the evidence beyond a reasonable doubt that the defendant Baniel Burton, at a time when he was not in danger of death or great bodily harm at the hands of the deceased, Brent Tarter, armed himself with a deadly weapon, and thus armed went to the home of the deceased, Brent Tarter, for the purpose of killing him or doing him some great bodily harm, and with the intention of bringing on the difficulty and for the said purpose challenged the said decedent Brent Tarter to combat, or for the said purpose did use such abusive or insulting language to him as was reasonably calculated to provoke an assault from him, the said decedent, and did willingly engage in the conflict with said decedent up to the time that he fired the shot that took the life of said decedent, if he did fire such shot, then and in that event the defendant cannot be excused on the grounds of self-defense or apparent necessity."

The argument is that appellant's evidence, which is the only reasonable account of what occurred, shows that he was on a peaceable mission, and that there was no evidence on which to base the foregoing instruction. In brief, appellant's evidence is that he intended to go to church; that he stayed behind to close the doors; that he then saw a half-grown rabbit and got his gun for the purpose of killing the rabbit; that he followed the rabbit, which ran in the direction of the home of the deceased; and that, after some conversation with the deceased, he shot deceased because the deceased was about to kill him. As not only was appellant contradicted in other particulars, but his story about the rabbit carried with it the earmarks of improbability, it is at once apparent that his evidence was not conclusive either on the court or on the jury. Aside from these considerations, we have the uncontradicted fact that he did arm himself with a shotgun and go to the home of the deceased and kill him. There is also evidence to the effect that before the shot was fired he cursed the deceased and dared him to fight. Therefore, even if the deceased first assaulted appellant with a gun, the case is one where there was evidence that ap-

pellant appeared at the home of the deceased, armed with a shotgun, and not only challenged the deceased to fight, but used abusive language reasonably calculated to provoke an assault from the deceased. If that be true, appellant was not entitled to rely on self-defense, Harris v. Commonwealth, 140 Ky. 41, 130 S. W. 801; Commonwealth v. Ashcraft, 224 Ky. 203, 5 S. W. (2d) 1067; and whether true or not was a question for the jury, and not for the court. It follows that the instruction qualifying the right of self-defense was proper.

On the whole, we find no error in the record prejudicial to appellant's substantial rights.

Judgment affirmed.